UNITED STATES of America,
Plaintiff,

v.

Jose GALVEZ–BARRIOS, Defendant.

No. 04–CR–14.

United States District Court,
E.D. Wisconsin.

Feb. 2, 2005.

Penelope Fleming, Milwaukee, WI, for Plaintiff.

Jess Martinez, Jr., Milwaukee, WI, for Defendant.

## SENTENCING MEMORANDUM

ADELMAN, District Judge.

In *United States v. Booker*, —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the Supreme Court held that the federal sentencing guidelines violated the Sixth Amendment. As a remedy, the Court excised that part of the Sentencing Reform Act that made the guidelines mandatory, 18 U.S.C. § 3553(b). "So modified, the . . . Sentencing Reform Act of 1984 . . . makes the Guidelines effectively advisory. It requires a sentencing court to consider Guidelines ranges, *see* 18 U.S.C.A. § 3553(a)(4) (Supp.2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, *see* § 3553(a) (Supp.2004)." *Id.* at 757.

In *United States v. Ranum*, 353 F.Supp.2d 984, 985–86 (E.D.Wis.2005), I set forth what I believed to be the proper methodology for sentencing post-*Booker*.

I applied that methodology in sentencing the defendant, Jose Galvez–Barrios. In this memorandum, I explain how I determined what sentence to impose and how the advisory guidelines figured into that determination.

## I. FACTS AND BACKGROUND

Defendant was born in Mexico in 1966, and when he was twelve or thirteen followed his stepfather and brothers to the United States. Eventually, his whole family came to this country. In 1986, he moved to Chicago, acquired permanent resident status, a social security number and lawful employment. In 1987, he began a long-term relationship with Alcira Lucrecia–Azanon, with whom he has four children, ages sixteen, fifteen, thirteen and four.

In 1993, defendant was convicted of aggravated battery with a firearm in Illinois state court and sentenced to ten years in prison. The charge arose out of an incident in which defendant shot a man while attempting to regain property that the man and his gang associates had taken from defendant after beating and robbing him. Shortly after the incident, defendant turned himself in. The police indicated that had he not done so the crime likely would have gone unsolved. Defendant pleaded guilty after the state substantially reduced the initial charge of attempted first degree murder.

In January 1998, defendant was paroled and deported to Mexico. In January 2000, he re-entered the country, and in September 2002, was found and deported. He subsequently re-entered the United States and returned to Chicago, where he lived with and supported his family while working as a truck driver. In January 2004, when his truck became disabled during a snow storm, sheriff's deputies who arrived

to help defendant discovered that he was here illegally and arrested him.

Defendant pleaded guilty to a violation of 8 U.S.C. § 1326(b)(2), unlawful re-entry after deportation following an aggravated felony. The Pre-sentence Report ("PSR") set his offense level at 21 and his criminal history category at II, producing an imprisonment range of 41–51 months under the guidelines. At sentencing, the government recommended a guideline sentence, and defendant argued for a 15–21 month sentence. For the reasons stated below, I sentenced defendant to 24 months.

## II. DISCUSSION

### A. Sentencing Methodology Post-Booker

Title 18, U.S.Code § 3553(a) now governs federal sentencing. It requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." Section 3553(a)(2) states that such purposes are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) also instructs sentencing courts to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (3) the kinds of sentences available; (4) the sentencing range established by the guidelines; (5) any pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. I have found it helpful to group these factors into three main categories: the nature of the offense, the history and character of the defendant, and the needs of the public and any victims of the crime.

### B. Application to the Present Case

#### 1. Nature of Offense

The offense conduct in the present case consisted of defendant's re-entry into the United States without permission after having been convicted of a serious felony and removed. All violations of our immigration laws must be taken seriously. However, the seriousness of defendant's offense was mitigated by the fact that he re-entered to support his family and did not violate the law after he arrived. The only aggravating factor was that defendant had previously unlawfully re-entered the country and been removed, and thus knew that he had no legal right to be here.

#### 2. History and Character of Defendant

Defendant's history and character are largely positive. He has been in a stable relationship with the same woman for seventeen years and supported his family. At sentencing, defendant explained that his biological father abandoned him when he was a child, and he did not want to do the same thing to his children. He also stated that in his absence his family encountered financial difficulties. Steadily employed as a truck driver, defendant paid taxes and filed tax returns, atypical conduct among the § 1326 defendants I have seen. Defendant's employer stated that defendant was an excellent worker, whom he would rehire without hesitation. Defendant's

friends and neighbors as well as his parish priest wrote laudatory letters about him. In sum, from a family and employment standpoint, defendant did all of the things we want people to do.

I also considered defendant's immigration and criminal history. As stated, he first came to the United States more than twenty years ago, has strong family ties here and none in Mexico. At sentencing, defendant expressed gratitude to the United States for the opportunities this country afforded him and his children. With respect to his record, his sole prior conviction was the 1993 aggravated battery for which there were some mitigating circumstances. I concluded, based on his history and his character, that defendant was not a danger to society.

### 3. Needs of the Public

I also considered the needs of the public, including the need to promote respect for immigration law and to deter removed felons from re-entering. In the present case, this factor supported a substantial prison sentence. However, as noted, defendant is not dangerous and, therefore, lengthy incarceration was not necessary to protect the public.

### 4. Advisory Guidelines

As *Booker* directs, in determining defendant's sentence I gave serious consideration to the advisory guidelines. In the present case, I determined that: (1) the manner in which the guidelines calculated defendant's offense level was flawed; and (2) nevertheless, with modifications to account for the flaws, the guidelines helped translate my findings under § 3553(a) into a numerical sentence. I discuss each of these points below.

### a. Problems With Guidelines in § 1326 Offenses

The guidelines treat § 1326(b) offenses very seriously. In the present case, as in most others in this district, they established an offense level of 21 (base level 8, U.S.S.G. § 2L1.2(a), plus 16 based on a prior serious felony, § 2L1.2(b)(1)(A), minus 3 for acceptance of responsibility, § 3E1.1). Although § 1326 offenses must be taken seriously, the guidelines establish the offense level for such crimes in an unusual way. The guidelines in chapter two typically establish offense levels based on a defendant's relevant conduct, not on his prior record. This makes sense because the criminal history chapter of the guidelines separately scores a defendant's prior record. However, § 2L1.2, which governs § 1326 cases, gives heavy weight to a defendant's prior convictions in establishing his offense level.[1] Courts and commentators have criticized this aspect of § 2L1.2, as well as its general harshness. *See, e.g.,* Robert J. McWhirter & Jon M. Sands, *A Defense Perspective on Sentencing in Aggravated Felon Re-entry Cases,* 8 FED. SEN. REP. 275 (Mar/Apr.1996); *see also United States v. Cruz–Guevara,* 209 F.3d 644 (7th Cir.2000).

I examined the history of § 2L1.2 to try to determine its rationale and whether such rationale was applicable in the present case. The Commission originally set the § 2L1.2 offense level at 6 based on its analysis of past sentencing practices. In 1988, it increased the offense level to 8 to create a harsher penalty. In 1989, the Commission provided for a 4 level enhancement for defendants previously convicted of certain felonies. The Commission stated that this enhancement was to

---

1. In this respect, § 2L1.2 slightly resembles the felon in possession guideline, § 2K2.1. However, § 2K2.1 bases some of its offense level enhancements, such as those based on the type and number of weapons possessed, on a defendant's conduct rather than his criminal history.

apply in addition to the inclusion of the prior offense in the defendant's criminal history score. In 1991, the Commission upped the offense level even more dramatically, providing for 16 level enhancements for those previously convicted of felonies designated as aggravated. McWhirter & Sands, *supra*, at 275.

To put the Commission's action into perspective, the theft guideline called for a 16 level enhancement if the defendant stole $5,000,000 to $10,000,000, and the fraud guideline provided for a 16 level enhancement if the defendant's conduct caused a loss of $20,000,000 to $40,000,000. *See* James P. Fleissner & James A. Shapiro, *Sentencing Illegal Aliens Convicted of Reentry After Deportation: A Proposal for Simplified and Principled Sentencing*, 8 FED. SEN. REP. 264, 268 (Mar./Apr.1996). As its reason for the amendment, the Commission stated only:

> This amendment adds a specific offense characteristic providing an increase of 16 levels above the base offense level under § 2L1.2 for defendants who reenter the United States after having been deported subsequent to conviction for an aggravated felony. Previously, such cases were addressed by a recommendation for consideration of an upward departure.... The Commission has determined that these increased offense levels are appropriate to reflect the serious nature of these offenses.

U.S. SENTENCING GUIDELINES MANUAL app. C—Vol. I 241 (2003) (Amendment 375). According to McWhirter and Sands:

> The Commission did no study to determine if such sentences were necessary—or desirable from any penal theory. Indeed, no research supports such a drastic upheaval. No Commission studies recommended such a high level, nor did any other known grounds warrant it. Commissioner Michael Gelacak suggested the 16–level increase and the Com-

mission passed it with relatively little discussion. The 16–level increase, therefore, is a guideline anomaly—an anomaly with dire consequences.

McWhirter & Sands, *supra*, at 276.

In 2001, the Commission diminished some of the harshness of § 2L1.2 by providing gradations of enhancements, from 8 to 16 levels depending on the perceived seriousness of the prior felony. *See* Robert J. McWhirter, *Aggravated Felon Reentry Cases Under the 2001 Guideline*, 14 FED. SEN. REP. 295 (Mar/Apr.2002). The Commission stated that the amendment:

> respond[ed] to concerns raised by a number of judges, probation officers, and defense attorneys ... that § 2L1.2 ... sometimes results in disproportionate penalties because of the 16–level enhancement provided in the guideline for a prior conviction for an aggravated felony.... The Commission also observed that the criminal justice system has been addressing this inequity on an *ad hoc* basis in such cases by increased use of departures.

U.S. SENTENCING GUIDELINES MANUAL app. C—Vol. II 218 (2003) (Amendment 632).

However, even with this modification, application of the guideline will remain problematic for certain defendants. It may be that severely punishing those convicted of re-entering after committing a serious felony will protect the public because such persons may reasonably be considered more dangerous. *See* McWhirter & Sands, *supra*, at 275. It may also be that such persons should be subject to a greater penalty as a deterrent to re-entry. *See* Fleissner & Shapiro, *supra* at 268. Nevertheless, such justifications substantially overlap with those the Commission uses to justify increasing the defendant's criminal history score. *See* U.S.S.G. ch. 4, pt. A, introductory cmt. (2004) (stating that the guidelines enhance

sentences based on the defendant's criminal history in part to serve the goals of deterrence and protection of the public). Although it is sound policy to increase a defendant's sentence based on his prior record, it is questionable whether a sentence should be increased twice on that basis. Further, imposing a 16 level enhancement (which in the present case increased the low end of the range from 4 to 57 months) seems far out of proportion to any reasonable assessment of dangerousness. *See* McWhirter & Sands, *supra,* at 276. This is particularly true in the present case where, for the reasons already stated, defendant was not a danger to society.

In imposing sentence in the present case, I was also troubled by the unwarranted sentencing disparity under the guidelines for § 1326 offenders. *See* Linda Drazga Maxfield & Keri Burchfield, *Immigration Offenses Involving Unlawful Entry: Is Federal Practice Comparable Across Districts?,* 14 FED. SEN. REP. 260, 262–63 (Mar./Apr.2002); Linda Drazga Maxfield, *Fiscal Year 2000 Update on Unlawful Entry Offenses,* 14 FED. SEN. REP. 267, 268–69 (Mar./Apr.2002). The disparity occurs because certain judicial districts utilize so-called "fast-track programs" in § 1326 cases. *See generally* Erin T. Middleton, *Fast–Track to Disparity: How Federal Sentencing Policies Along the Southwest Border Are Undermining the Sentencing Guidelines and Violating Equal Protection,* 2004 UTAH L. REV. 827. Through charge bargaining or stipulated departures, these programs allow a § 1326 offender who agrees to a quick guilty plea and uncontested removal to receive a reduced sentence. *Id.* at 829–30. In the Southern District of California, for exam-

ple, defendants subject to 20 year statutory maximums and guideline ranges of 70–87 months were allowed to plead guilty to an offense carrying a two year statutory maximum penalty. *See United States v. Banuelos–Rodriguez,* 215 F.3d 969 (9th Cir.2000). In other border districts, defendants received downward departures to induce fast pleas. *See* Middleton, *supra,* at 829–30. Recently, in the PROTECT Act, Congress made fast-track programs official, *see* Middleton, *supra,* at 838–40, and the Commission then enacted a guideline, § 5K3.1, providing for a 4 level departure on the government's motion pursuant to an early disposition program.

Although fast-track programs may be useful in helping busy border districts process more defendants,[2] they nevertheless create serious sentencing disparities. Because they operate only in certain districts (typically in southwestern states), an illegal alien stopped in California or Arizona will receive a lighter sentence than an alien convicted of the same offense and with the same record who is found in Wisconsin. Moreover, the amount of the fast-track sentence reduction can be substantial—in the present case from 41 to 27 months at the low end of the range. As one judge put it, "it is difficult to imagine a sentencing disparity less warranted than one which depends upon the accident of the judicial district in which the defendant happens to be arrested." *United States v. Bonnet–Grullon,* 53 F.Supp.2d 430, 435 (S.D.N.Y.1999), *aff'd,* 212 F.3d 692 (2d Cir. 2000). Therefore, under *Booker* and § 3553(a)(6), it may be appropriate in some cases for courts to exercise their discretion to minimize the sentencing disparity that fast-track programs create.

---

**2.** *See, e.g., The Effects of Region, Circuit, Caseload and Prosecutorial Policies on Disparity,* 15 FED. SEN. REP. 165 (Feb.2003) (panel discussion); Alan D. Bersin, *Reinventing Immigra-* tion Law Enforcement in the Southern District of California, 8 FED. SEN. REP. 254 (Mar. Apr. 1996).

### b. Determination of Sentence and Use of Guidelines

■ Considering all of the above factors, I concluded that the advisory guideline range in the present case was somewhat greater than necessary to satisfy the purposes of sentencing. I reached this conclusion for several reasons. First, the 16 level enhancement was excessive because it was based on (and double counted) a prior conviction that did not reflect the degree of dangerousness that could justify such a dramatic increase. Second, I considered it significant that defendant returned to the United States to be with and support his family, not to commit crimes or for purely economic reasons. Third, defendant promptly agreed to plead guilty, making it appropriate to reduce the disparity between his guideline sentence and those of defendants in fast-track districts. Instead, I concluded that a sentence of 24 months in prison was sufficient to reflect the seriousness of the offense, promote respect for the law and deter future crimes.

■ One of a judge's problems under a discretionary sentencing regime is explaining why he has imposed a specific sentence. Generalizations as to the seriousness of the offense or the quality of the defendant's character do little to explain a specific number within a broad statutory range. The advantage of having advisory guidelines is that judges can use guideline terminology to translate findings under § 3553(a) into a specific sentence. As I stressed in *Ranum* and reiterate here, courts need not strictly justify sentences by reference to the guidelines or identify non-heartland factors to justify sentences above or below the guideline range. However, in exercising discretion, courts can use the guidelines, recognizing their comprehensive nature and quantification of many relevant factors. I believe that this is what Justice Breyer had in mind when he instructed judges to consider the guidelines, but tailor sentences in light of the other factors set forth in § 3553(a).

In the present case, translating my assessment of such factors into guideline terms, I effectively granted a 4 level reduction by analogy to § 5K3.1. I also granted defendant a 3 level reduction based on his motive for re-entering the United States. *Cf. United States v. Martinez–Alvarez*, 256 F.Supp.2d 917, 922 (E.D.Wis.2003) (stating that a 3 level departure was reasonable when the § 1326 defendant re-entered based on his cultural assimilation and desire to join his family in the United States). These reductions effectively discounted the 16 level enhancement, recognized defendant's good character and honorable motive for re-entering, and eliminated unwarranted sentencing disparity, while still treating the offense as a serious one.

With these reductions, defendant's offense level would have been 17 and his criminal history category II, creating a low end sentence of 18 months. However, in order to account for his prior, uncharged re-entry, I believed it proper to effectively increase defendant's criminal history category to III, creating a 21–27 month range. Under all of the circumstances, I concluded that a sentence in the middle of such range was appropriate.[3]

### III. CONCLUSION

Therefore, I committed defendant to the custody of the Bureau of Prisons for 24

---

3. Alternatively, a 24 month sentence represented the top end of the modified range, an appropriate sentence taking into account defendant's prior, unlawful re-entry.

months. Other conditions of sentence appear in the judgment.