**UNITED STATES OF AMERICA,**

v.

**Esteban DURAN, Defendant.**

**No. 04 CR. 1086(VM).**

United States District Court,
S.D. New York.

Nov. 21, 2005.

Christopher Louis Garcia, U.S. Attorney's Office, New York, NY, for Plaintiff.

*DECISION AND ORDER*

MARRERO, District Judge.

The defendant, Esteban Duran ("Duran"), entered a guilty plea before this Court on July 15, 2005 to a one count indictment charging illegal reentry of the United States after deportation subsequent to a conviction for the commission of

an aggravated felony in violation of 8 U.S.C. § 1326. Duran and the Government subsequently submitted letters to the Court detailing their respective positions regarding Duran's sentencing. Duran argues that the Court should impose a sentence below the Guidelines' sentencing range for two reasons: that the Guidelines allegedly double-count Duran's criminal history and that a Guidelines sentence would result in an unwarranted sentencing disparity. The Court has reviewed the parties' submissions and finds that they raise important policy and legal questions that have not yet been fully resolved in this District. The Court accordingly addresses these issues below.

## I. *BACKGROUND*

As noted above, Duran entered a guilty plea to a one count indictment charging illegal reentry into the United States after deportation subsequent to a conviction for the commission of an aggravated felony. According to the Presentence Investigation Report, Duran was deported following two convictions for criminal sale of a controlled substance and two convictions for attempted criminal possession and attempted criminal sale of a controlled substance. The Presentence Investigation Report also states that Duran was discovered to be in the United States illegally when he was arrested on August 14, 2004 for criminal sale of a controlled substance.

Under the Sentencing Guidelines, Duran's offense level amounts to 21 and his criminal history falls into Category VI. The Guidelines recommend a range of imprisonment for this offense level and criminal history category of 77 to 96 months. Duran argues that a Guidelines sentence is unreasonable in this case on two grounds: first, that the Guidelines allegedly double-count Duran's criminal history by factoring past criminal activity into the calculation of both his offense level and his criminal history category, and second that a

Guidelines sentence would result in an unwarranted sentencing disparity because certain defendants who plead guilty to illegal reentry in some other districts have the opportunity to participate in fast-track programs which result in substantially shorter sentences.

The Court is mindful that a significant legal and sentencing policy debate exists among district courts throughout the country with regard to these issues, specifically as they relate to illegal reentry cases. *See, e.g., United States v. Perez–Chavez,* 2005 U.S. Dist. LEXIS 9252, *8–*30 (D.Utah 2005) (finding downward departure from Guidelines sentencing range was not warranted on the basis of sentencing disparities caused by the existence of fast-track programs in some, but not all, districts); *United States v. Galvez–Barrios,* 355 F.Supp.2d 958, 961–65 (E.D.Wis.2005) (finding downward departure from Guidelines' sentence range was warranted because Guidelines inappropriately double-counted defendant's prior offenses and because the existence of fast-track programs in other districts created unwarranted sentencing disparities); *United States v. Delgado,* 6:05–cr–30–Orl–31KRS, at 2–4 (M.D. Fla. June 7, 2005) (finding downward departure warranted based on sentencing disparity caused by the existence of fast-track programs in some, but not all, districts).

That division has manifested among various judges in this district. *See, e.g.,* Transcript of Sentencing at 8:3–9:12, *United States v. Justo,* 04 CR. 797(JSR) (S.D.N.Y. April 14, 2005) (*"Justo* Sent. Tr."); Transcript of Sentencing at 12:10–16:9, *United States v. Perez–Gallegos,* 04 CR. 1274(GEL) (S.D.N.Y. July 5, 2005) (*"Perez–Gallegos* Sent. Tr."); Transcript of Sentencing at 25:10–27:3, *United States v. Mejia,* 04 CR. 1082(JFK) (S.D.N.Y. July 14, 2005) (*"Mejia* Sent. Tr.") (rejecting argu-

ments that downward departure or non-Guidelines sentence is warranted based on either double-counting of defendant's prior offenses under the Guidelines or sentencing disparities resulting from the existence of fast-track programs in some districts but not in others). *But see* Transcript of Sentencing at 4:1–8:14, *United States v. Krukowski,* 04 CR. 1308(LAK) (S.D.N.Y. July 25, 2005) (finding that disparities caused by the existence of fast-track programs are "unwarranted," but nonetheless imposing a sentence within the Guidelines' range because such sentence was not substantially greater than what defendant would have qualified for in a fast-track program district); Transcript of Sentencing at 13:24–18:5, *United States v. Gonzales–Martes,* 04 CR. 1081(SAS) (S.D.N.Y. 2005) (rejecting argument that Guidelines inappropriately double-count defendant's prior offenses but imposing non-Guidelines sentence based, in part, on concerns about sentencing disparities caused by the existence of fact-track programs in some districts and not in others).

Because the numerous issues involved in this debate are still the subject of sharp division and remain in flux pending guidance from the Circuit Courts, this Court deems it more prudent not to render a firm pronouncement or adopt a definitive stance on the matter in this case. The Court does, however, offer some observations that may be pertinent to the debate, and to the sentencings that may be imposed in the course of it.

## A. *DOUBLE–COUNTING OF PRIOR OFFENSES*

■ In response to Duran's argument that the Guidelines double-count his prior offenses, the Court notes that prior offenses are appropriately factored into both the offense level and the criminal history category because prior offenses play a separate and distinct role in each category. *See United States v. Campbell,* 967 F.2d 20, 25 (2d Cir.1992). The offense level "represents a judgment as to the wrongfulness of the particular act." *Id.* The criminal history category principally estimates the "likelihood of recidivism." *Id.* (citing *U.S. Sentencing Guidelines Manual,* Chapter 4, Introductory Commentary (2004)). In *Campbell,* the Second Circuit rejected a challenge to a judge's use of a prior conviction to calculate both offense level and criminal history category in an illegal reentry case, holding that while counting a prior offense in the calculation of both criminal history and offense level "may be double counting in a literal sense, double counting is legitimate where a single act is relevant to two dimensions of the Guidelines analysis." *See* 967 F.2d at 25.

It is argued that the 16–level enhancement the Commission promulgated pursuant to Guidelines § 2L1.2(b)(1)(A) for reentry after deportation for a prior drug trafficking felony, allegedly with little public debate, represents an arbitrary number that in many cases yields unduly harsh and apparently disproportionate sentences. *See Galvez–Barrios,* 355 F.Supp.2d at 962. But that critique could be leveled just as validly as to countless other numerical indices—quantity of drugs or amounts of money involved in a crime, for example—that the Guidelines Commission and Congress employ to enhance culpability and reflect the seriousness of particular offenses, with no less random gradation, and often with equally severe results. In any event, the sentencing court's unhappiness over the process by which any particular aspect of the Guidelines was enacted is a consideration beyond the ambit of permissible sentencing reasons.

## B. *SENTENCING DISPARITIES CAUSED BY THE CONCEPTUAL SPLIT AMONG JUDGES*

As a result of differences in interpretation of the Sentencing Guidelines in light

of *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and 18 U.S.C. § 3553(a), substantial variations in sentences for illegal reentry cases have been produced in different districts. The effects will be most pronounced, and potentially even pernicious, in districts where judges of the same court split conceptually into different camps and impose sentences for this offense depending upon whether they accept or reject the double-counting and fast-track arguments as legitimate grounds to guide their sentencing decisions. By dint of that discord, a form of wheel-of-fortune effect may be emerging in some districts, in consequence of which the length of particular illegal reentry offenders' sentences will be determined, or even predetermined, by whether or not the judge randomly assigned the case conceptually recognizes the double-counting and fast-track considerations as decisive grounds for modifying the sentence produced by application of the Guidelines.

Insofar as the division exists and some courts categorically rely upon the double-counting issue and fast-track programs as grounds warranting sentences lower than the ranges produced by the Guidelines, while others just as firmly reject those considerations, the net result over time will be a tendency to build into the national sentencing scheme greater disparity in sentences in illegal reentry cases. The resulting disparities in sentences for such illegal reentry may thus be considered "unwarranted" because the disparities stem from an individual judge's conceptual stance on the underlying issue, rather than from any characteristics of the particular offender or offense. If enough courts or judges divide substantially on both sides of the debate, say evenly, the average length of sentence for the crime of illegal reentry would fall well below what the Guidelines' range would provide and at around a midpoint between the duration of sentences imposed by the courts that recognize dou-

ble-counting and fast-track and those that do not. However, until the double-counting and fast-track matters are resolved by higher courts, disparities in sentencing will continue. Arguably, the buildup of those disparities may eventually provide some grounds for adjustment pursuant to 18 U.S.C. § 3553(a)(6), which directs the Court to consider the need to avoid "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct" as a consideration in determining an appropriate sentence for a particular defendant.

## C. SENTENCING DISPARITIES ARISING FROM THE EXISTENCE OF FAST-TRACK PROGRAMS IN SOME DISTRICTS

While the disparities resulting from the division between judges described above may be considered "unwarranted" because the disparities stem from individual judge's conceptual position on the issue, disparities created by the existence of fast-track programs in some districts but not in others may not be "unwarranted" in that the disparities are similar to disparities created by individual prosecutors' decision-making as to particular defendants, offenses, or geographical considerations. As a court in this district stated, "the Government has always, and will always, give special consideration to certain defendants in order to save resources and advance criminal calendars. That results in different sentences for different people for reasons not having to do with culpability. It's a part of the plea bargaining system that we are all used to." *Perez–Gallegos* Sent. Tr. at 14:21–15:2.

Furthermore, in some respects, the comparison between an illegal reentry defendant's sentencing range under the Guidelines in a non-fast-track district and sentences for the same offense in a fast-

track district may be flawed insofar as the analysis fails to consider two qualifiers. First, not every illegal reentry defendant is eligible to participate in a fast-track program in the districts where a fast-track program exists. The programs' criteria, which vary from district to district, permit disqualification of certain offenders on the basis of prior convictions for crimes of violence or felony drug or firearms offenses, or on the basis of having ten or more criminal history points under the Sentencing Guidelines, or for prior convictions for illegal reentry under Section 1326. (*See* Letter from Christopher L. Garcia to United States District Judge Victor Marrero, dated July 22, 2005 ("Gov.'s Letter"), at 10.) Thus, the pool of eligible participants is determined to some degree by the exercise of prosecutorial discretion and interpretation of the program's criteria.

Second, to participate in a fast-track program, defendants must decide to waive certain important rights—such as the right to be indicted by a grand jury, to file pretrial motions, to have a jury trial, to review a presentence report, and to appeal the sentence—and, in some districts, the right to challenge deportation. *See* Gov.'s Letter at 7 (citing Alan D. Bersin and Judith S. Feigin, *The Rule of Law at the Margin Reinventing Prosecution Policy in the Southern District of California*, 12 Geo. Immigr. L.U. 285, 301 (1998)). In this respect, participation in a fast-track program is not unlike the choice, with attendant risks, that defendants make when they waive rights and potentially expose themselves to more serious charges by agreeing to cooperate with the Government in the hope of a lower sentence in light of the factors in Section 5K1.1 of the Sentencing Guidelines. Moreover, for personal and social reasons, the immediate deportation component of some fast-track programs may render participation unappealing to some offenders. This prospect may occur especially among defendants with strong family ties to relatives in this country with whom they may wish to prolong contact, or those who may not be eager for the unwelcome reception they may anticipate upon return to their country of origin.

Possibly on account of these considerations, not all illegal reentry defendants in fast-track districts choose to participate in the program. According to Government statistics from the Southern District of California, approximately 74 percent of illegal reentry defendants participated in the fast-track program in 2004, while approximately 23 percent, a significant number, pled guilty without participating in the fast-track program, and the rest proceeded to trial. (*See* Gov.'s Letter at 10–11.) Assuming that ratio is representative of other districts, that a substantial number of illegal reentry offenders elect not to participate in the fast-track program suggests that to make an apposite contrast between sentencing in fast-track and non-fast-track districts the analysis should compare sentencing in non-fast-track districts and sentencing of those in fast-track districts who choose not to avail themselves of the benefits and corresponding burdens of the program. Furthermore, a proper inquiry into any sentencing disparities for illegal reentry between fast-track and non-fast-track districts should take account of sentencing differences that may exist within fast-track districts as between participants and non-participants of the program. In addition, a court in a non-fast-track district cannot speculate as to whether any particular illegal reentry defendant would necessarily choose to participate if such a program were available.

There are also conceptual and jurisdictional dimensions of the debate that bear upon the Court's assessment here. To some extent, the disparities in sentencing

that the Guidelines were intended to minimize, and that 18 U.S.C. § 3553(a)(6) enumerates as one of the considerations courts should weigh in deciding an appropriate sentence for a particular defendant, relate substantially to two specific forms of concerns regarding what 18 U.S.C. § 3553(a) characterizes as "unwarranted disparities." The first relate to sentencing dissimilarities that could reflect, within the range of discretion accorded to the court, subjective differences disproportionately affecting defendants or sets of offenders. The second concern encompasses normative judgments of particular judges regarding the relative culpability of given criminal conduct, or the severity of punishment associated with particular offenses. A major part of the reason for limiting judicial discretion so as to reduce significant deviations in sentencing involving supposedly comparable offenses, offenders and circumstances is to give due recognition and proper effect to congressional policy determinations embodying the definition of crimes and the proper penalties corresponding to them, free of undue judicial interference. These jurisdictional considerations are not necessarily implicated in potential sentencing disparities that derive from proper exercise of prosecutorial discretion and allocation of resources in pursuit of legitimate executive branch law enforcement or social objectives.

In this regard, the disparities between sentencing in fast-track and non-fast-track districts arise from prosecutorial decisions similar to an individual prosecutor's decisions to charge, to engage in plea-bargaining or offer cooperation agreements, or to a particular United States Attorney's Office's policies regarding charging or plea bargaining. Of necessity, a prosecutor's choice to charge certain offenders or offenses more severely than others or to enter into plea agreements with some defendants but not others involved in the same crime is bound to engender signifi-

cant variations in the sentences that result in the same case or type of case, or from one district to another where different prosecutorial policies or social conditions may prevail. But such inevitable, indeed probably common, sentencing disparities as regards other cases could not serve to warrant determination by a court in one district to impose sentences resting solely or even predominantly on the existence of that policy in another court or district. To this degree this Court regards the illegal reentry cases not appreciably different from others that may raise similar prosecutorial policy issues, even if not with the same quantitative or geographic scope or level of formality that governs the fast-track program. The Court also finds persuasive the view of the several judges in this district who have held that in and of itself sentencing disparities that arise as a result of the existence of fast-track programs in other districts do not warrant a departure from the guidelines. *See, e.g., Justo,* 04 CR. 797(JSR), Sent. Tr. at 8–9; *Perez–Gallegos,* 04 CR. 1274(GEL), Sent. Tr. at 12–16; *Mejia,* 04 CR. 1082(JFK), Sent. Tr. at 25–27.

### D. *APPLICATION TO DURAN*

■ Although the Court is not persuaded that a departure is categorically warranted on the basis of double-counting and fast-track district grounds, the Court is mindful, as suggested above, of the reality that until these issues are ultimately resolved by higher courts, sentencing disparities are developing within the district in these cases among the judges who consider, at some point and in some measure, the fast-track and double-counting factors and those who do not, and that conceivably those differences may provide some grounds for adjustment under this criterion pursuant to 18 U.S.C. § 3553(a).

Turning to Duran, the Court has considered that Duran is currently serving a substantial State sentence for offenses related to his prosecution in the instant case. In recognition of this consideration, pursuant to 18 U.S.C. § 3553(a) and the policy statement outlined in Section 5G1.3(c) of the Sentencing Guidelines, the Court directs that Duran's sentence imposed here run concurrently with his undischarged State sentence.

Some courts have found downward adjustments warranted in illegal reentry cases where the defendant did not commit any further serious criminal offenses after illegally reentering the United States, regularly maintained gainful employment, or supported for substantial periods of time households of family members who were citizens or legal residents. *See, e.g., United States v. Perez,* 04 Cr. 0376(RJH), Sent. Tr. at 12–13 (Holwell, J.). Duran's conduct after reentry, however, does not provide a basis for a downward adjustment to his sentence on any of these grounds. After illegally reentering the United States, Duran was convicted of a drug sale—the same offense for which he was convicted prior to his deportation. In fact, Duran was convicted of six separate offenses related to drug sales or possession prior to his deportation.

## II. *CONCLUSION*

■ Considering the grounds stated in 18 U.S.C. § 3553(a), this Court finds that a 77–month sentence of imprisonment, to run concurrently with Duran's State sentence, is reasonable and appropriate, in that such a term is "sufficient, but not greater than necessary," to promote the proper objectives of sentencing. 18 U.S.C. § 3553(a). The Court further imposes a term of three years supervised release. The Court does not impose a fine because the Court has determined that Duran does not have the ability to pay such a fine. However, Duran is ordered to pay to the United States a special assessment of $100, which shall be due immediately.

**SO ORDERED.**